**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DONNA A. BOGARDUS-FRY,**

                                        **Plaintiff,**

        **vs.**                                        **7:11-CV-883**
                                                       **(MAD)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

                                        **Defendant.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

CONBOY, McKAY, BACHMAN & KENDALL, LLP    Lawrence D. Hasseler, Esq.
407 Sherman St
Watertown, NY 13601
_Attorney for Plaintiff_

Social Security Administration             Benil Abraham, Esq.
Office of General Counsel                  Special Assistant
26 Federal Plaza, Rm. 3904                 United States Attorney
New York, NY 10278
_Attorney for Defendant_

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM - DECISION AND ORDER

### INTRODUCTION

Plaintiff Donna A. Bogardus-Fry brings the above-captioned action pursuant to 42 U.S.C.

§ 405(g) seeking a review of the decision from the Commissioner of Social Security

("Commissioner") that denied her application for disability insurance benefits ("DIB") and

supplemental social security income ("SSI").

### PROCEDURAL BACKGROUND

On April 17, 2008, plaintiff protectively filed an application for DIB and SSI benefits. (T. 44, 100)[1].  Plaintiff was 32 years old at the time of he application with prior work experience as a cashier, daycare provider, waitress, and food preparer.  (T. 25-27, 29).  Plaintiff claimed that she became unable to work beginning on May 10, 2006 due to a lumbar disc herniation, a cervical disc herniation, fibromyalgia/myofascial pain syndrome, Crohn's disease, colitis, pulmonary nodules, and obesity.  (T. 11, 29, 32-33, 35-36, 45).  On August 5, 2008, plaintiff's application was denied and plaintiff requested a hearing by an Administrative Law Judge ("ALJ"), which was held on January 14, 2010. (T. 18).  Plaintiff appeared with an attorney.  On February 25, 2010, the ALJ issued a decision denying plaintiff's claim for benefits. (T. 16-17).  The Appeals Council denied plaintiff's review on July 8, 2011, making the ALJ's decision the final determination of the Commissioner.  (T. 1-5). This action followed.

## DISCUSSION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of

---

[1]"(T.)" refers to pages of the Administrative Transcript, Dkt. No. 10.

> proof on the first four steps, while the Social Security
> Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311

F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal

citations omitted).

A Commissioner's determination that a claimant is not disabled will be set aside when the

factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw*,

221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set

aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d

72, 77 (2d Cir. 1999).

The ALJ found at step one that plaintiff has not engaged in substantial gainful activity

since May 20, 2006. (T. 11). At step two, the ALJ concluded that plaintiff suffered from the

following severe impairments: obesity, asthma, pulmonary nodules, Crohn's disease, colitis,

degenerative cervical and lumbar disc disease, fibromyalgia/myofascial pain syndrome and

cannabis abuse. (T. 11). At step three, the ALJ determined that plaintiff does not have an

impairment or combination of impairments that meets or medically equals one of the listed

impairments in the Listing of Impairments. The ALJ then found the plaintiff had the Residual

Functional Capacity ("RFC") to "lift and/or carry 20 pounds occasionally and 10 pounds

frequently, stand and/or walk for a total of six hours in an eight-hour workday, sit for a total of six

hours in an eight-hour workday, and occasionally climb, balance, stoop, kneel, crouch and crawl.

She should avoid more than moderate exposure to fumes, odors, dust, gases, poor ventilation,

extreme temperatures and humidity." (T. 12). At step four, the ALJ concluded that plaintiff was

not capable of performing any of her past relevant work. (T. 15). At step five, relying on the

Medical-Vocational Guidelines ("the grids") set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ found that plaintiff had the RFC to perform jobs existing in significant numbers in the national economy. (T. 16). Therefore, the ALJ concluded that plaintiff was not under disability as defined by the Act. (T. 16-17).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that the ALJ erred by failing to: (1) find that plaintiff's spine impairment met the criteria for Listing 1.04A in the Listing of Impairments; (2) properly review and weigh the medical evidence of record; (3) properly assess plaintiff's credibility; (4) properly assess plaintiff's RFC; and (5) support his conclusion with substantial evidence that plaintiff can perform other work that exists in the national economy in significant numbers.

## I.      Meet or Medically Equals a Listed Impairment–Listing § 1.04A

"The Listing of Impairments describes, for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." 20 C.F.R. § 416.925(a). If the claimant's impairment or combination of impairments meets or equals a listed impairment, then the disability analysis ceases and the claimant is considered disabled without any further consideration undertaken in regard to the claimant's age, education, or work experience. *See Campbell v. Astrue*, No. 8:07-CV-0758, 2009 WL 2152314, at *4 (N.D.N.Y. July 14, 2009) (citing 20 C.F.R. § 416.920(a)(4)(iii)). A claimant is automatically entitled to benefits if her impairment(s) meets the criteria set forth in Appendix 1 to Subpart P of Part 404. *McKinney v. Astrue*, 2008 WL 312758, *4 (N.D.N.Y. 2008). The burden is on the plaintiff to present medical findings which show that her impairments match a listing or are equal in severity to a listed impairment. *Zwick v. Apfel*, 1998 WL 426800, at *6 (S.D.N.Y.1998). In order to show that an impairment matches a listing, the claimant must show that her impairment meets all of the

specified medical criteria. *Pratt v. Astrue*, 2008 WL 2594430, at *6 (N.D.N.Y.2008) (citing

*Sullivan v. Zebley*, 493 U .S. 521, 530 (1990)) (holding that if a claimant's impairment "manifests

only some of those criteria, no matter how severely," such impairment does not qualify).  Courts

have required an ALJ to provide an explanation as to why the claimant failed to meet or equal the

Listings, "[w]here the claimant's symptoms as described by the medical evidence appear to match

those described in the Listings." *Rockwood v. Astrue*, 614 F.Supp.2d 252, 273 (N.D.N.Y. 2009)

(citation omitted).

The requirements of disability for spine disorders listed in 20 C.F.R. Part 404, Subpt. P,

App. 1, state:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal
> arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease,
> facet arthritis, vertebral fracture), resulting in compromise of a nerve
> root (including the cauda equina) or the spinal cord. With:
>
> A.  Evidence of nerve root compression characterized by
> neuro-anatomic distribution of pain, limitation of motion of the spine,
> motor loss (atrophy with associated muscle weakness or muscle
> weakness) accompanied by sensory or reflex loss and, if there is
> involvement of the lower back, positive straight-leg raising test (sitting
> and supine).

The plaintiff's medical records must demonstrate that plaintiff suffered from nerve root

compression and each of the four characteristics required by the Listing for the relevant time

period. *See Sullivan*, 493 U.S. at 530.

The ALJ is charged with carefully considering all the relevant evidence and linking his

findings to specific evidence. *Backus v. Astrue*, 2008 WL 4519006, at *10 (N.D.N.Y. 2008)

(citing *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001) (internal citations omitted)

(holding that the record must demonstrate that the ALJ considered all of the evidence with a

discussion of not only the evidence the ALJ relied upon but also the evidence he rejected)).

Courts do not hesitate to remand a case for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence at step three. *Id.* (citing *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir.1996)).  "[I]n the absence of findings supported by specific weighing of the evidence, the Court c[an] not assess ALJ's conclusion that the appellant's impairments did not meet or equal any Listed Impairment, and whether he applied the correct legal standards to arrive at that conclusion." *Peck v. Barnhart*, 2006 WL 3775866, at *4-6 (10th Cir. 2006) (the ALJ's "bare conclusion" was "beyond meaningful judicial review").

Here, the ALJ concluded that, "[t]he clinical signs, symptoms and functional limitations from the claimant's impairments are not of the required severity to meet or equal the specific criteria of any listed impairments.  The Administrative Law Judge paid particular attention to listings, 1.04, 3.03, 5.06, and 12.09." (T. 12).

Plaintiff claims that her spinal condition meets all the requisites of Listing 1.04(A) to qualify her for an automatic determination of disabled in step three of the disability analysis. (Dkt. No. 15, p. 13).  Plaintiff also claims that the ALJ failed to "conduct any listings analysis whatsoever" and that this requires the case to be remanded for further consideration.  In support, plaintiff cites to her various MRI films as specific evidence of nerve root compression.  On July 10, 2006 and December 18, 2006, plaintiff underwent MRIs of her lumbar spine. Plaintiff's treating sources and medical providers reviewed these films and provided their opinions and interpretations.  The July 10, 2006 films were taken at Claxton-Hepburn Medical Center and the report indicates, "moderate degenerative disc disease with diminished disc height and dessication as well as moderate posterior disc bulging at L4-5 and L5-S1." (T. 442).  The report also provides, "exiting nerve roots appear normal".  On December 6, 2006, Robert E. Hemond ("Hemond"), a physician's assistant at Fletcher Allen Spine Institute, opined that the films

revealed a "broad based disc bulge at L4-5 with mild compression of the traversing L5 nerve on the left" and "a right central disc bulge with compression of the traversing S1 nerve root on the right." (T. 500).

On December 18, 2006, plaintiff had a second MRI of her lumbar spine at Canton-Potsdam Hospital. (T. 294). The report generated indicated that plaintiff suffered from slight protrusion identified at 5-1 and mild bulging at 4-5 with no other significant findings. The physician also concluded that the protrusion at the 5-1 level "does appear to be affecting the descending right S1 nerve root". On January 31, 2007, Hemond noted, "MRI of the LS spine dated December 18, 2006 is essentially unchanged from her previous films. T2-weighted axial images reveal mildly bulging disk at L4-5 with compression traversing L5 nerve root on the left that is mild and at L5-S1 there is a central disk bulge with compression of the S1 nerve roots bilaterally left greater than right." (T. 497). On July 11, 2007, plaintiff had an initial consultation with Dr. Ann Marie Gonzalez-Munoz at the Fletcher Allen Pain Management Clinic. Dr. Gonzalez-Munoz noted, " MRI studies per Mr. Hemond's report demonstrated mild disk bulge at L4-5 as well as L5-S1. This did result in mild neural foraminal narrowing with mild compression of the traversing L5 nerve root on the left and S1 nerve root on the right." (T. 472). The record also contains an MRI report from a third series of films performed approximately two years later on March 5, 2009 which revealed a "moderate sized central and left paracentral disc herniation at L4/5 level resting against the left L5 nerve root". The report also indicates "although not displacing the nerve root". (T. 588).

Plaintiff also cites to additional medical evidence in support of her claim that she meets the three remaining requirements for Listing 1.04A. To wit, plaintiff continually complained of pain and numbness radiating down her legs into her feet to her various treating physicians

including Drs. Savage, Vazquez-Senior, Gonzalez-Munoz, Ames (T. 194, 220, 476) and to Nurse Jean Bellinger and Hemond. (T. 384, 486).  Plaintiff also described her pain as constant, radiating and generally and "8 out of 10".  Plaintiff routinely exhibited positive results on straight leg raising (T. 220, 476, 499) and displayed a limited range of motion as verified by the physician who examined plaintiff at the request of the agency.  On March 2, 2009, James Naughten, D.O. performed an orthopedic examination.  Upon examination, he noted that plaintiff favored her right leg to a mild degree and walked on heels and toes with mild difficulty. (T. 572).  The examination of plaintiff's lumbar spine revealed "[f]lexion 50 degrees, extension 10 degrees, lateral flexion 10 degrees bilaterally", bilateral lumbar pain and spasm, paraspinal tenderness on palpation. (T. 573).    Here, the ALJ failed to mention or discuss any of the aforementioned MRI films.  Further, the ALJ did not discuss Hemond's interpretation of the films or Dr. Gonzalez-Munoz's opinions regarding the films at any step of the sequential analysis.  Moreover, while the ALJ acknowledged that plaintiff made complaints of numbness, tingling and pain that were exacerbated by prolonged standing and sitting to her treating physicians and during the administrative hearing, he failed to address these complaints in the context of his analysis of the listings. (T. 13, 14). *See Muntz v. Astrue*, 540 F.Supp.2d 411, 420 (W.D.N.Y.2008) (evidence of neuro-anatomic pain found throughout the record where the plaintiff complained to treating and examining physicians of back pain with radiation of numbness and weakness).  The ALJ also assigned "substantial weight" to Dr. Naughten's observations, but failed to mention or discuss the doctor's findings in the context of his analysis of the Listings.

The ALJ's decision contains no discussion of the specific Listing or any mention of the evidence that the ALJ considered or rejected in arriving at his conclusion at Step Three.  Upon a review of the record, the Court finds that the ALJ's determination is not supported by substantial

8

evidence. The ALJ improperly disregarded portions of the record that support plaintiff's claim

that she met Listing § 1.04A. The ALJ must consider the entire record in accordance with his duty

under 20 C.F.R. § 404.1520(3). *Sutherland v. Barnhart*, 322 F.Supp.2d 282, 289 (E.D.N.Y.

2004).  The ALJ's failure to discuss the aforementioned evidence and explain why claimant's

impairments did not satisfy the specific criteria of Listing § 1.04A was plain error.  *Walker ex rel.*

*J.B. v. Astrue,* 2010 WL 2287566, at *7 (N.D.N.Y. 2010) (citing *Morgan*, 913 F.Supp. at 188–189

(holding that a one-sentence denial is insufficient to support the determination, especially in light

of the considerable evidence to the contrary)).  The Second Circuit has held that, "[w]here there is

a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the

substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that

a claimant will be deprived of the right to have her disability determination made according to

legal principles ." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). The ALJ should have

considered all evidence available and provided some explanation as to why claimant's

impairments do not meet the criteria of § 1.04A.

  While there may be some evidence to support defendant's arguments and the ALJ's

position, the ALJ's decision cannot be upheld due to his failure to articulate his rationale or to

analyze the record in any meaningful way. The record contains at least some evidence that could

provide a basis for the conclusion that plaintiff's impairments meet the criteria for Listing §

1.04A.  It is well settled that "[w]here the claimant's symptoms as described by medical evidence

appear to match those described in the Listings, the ALJ must explain a finding of ineligibility

based on the Listings."  *Id.* (citing *Kerr v. Astrue*, 2010 WL 3907121, at *3-5 (N.D.N.Y. 2010)

("[w]here there is significant probative evidence that a claimant meets the criteria for a Listing at

step three, the case will be remanded if the court determines that the '[p]laintiff was owed a more

substantive discussion of why [ ]he did not meet [a particular Listing]'"). "It is particularly important for an ALJ to specifically address conflicting probative evidence with respect to the step three analysis, because a claimant whose condition meets or equals that of a Listing is deemed disabled *per se* and eligible to receive benefits." *Szarowicz v. Astrue*, 2012 WL 3095798, 4 -5  (W.D.N.Y. 2012) (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).

The ALJ's  failure to employ the correct legal standards at step three of the sequential analysis is reversible error, because the Court cannot engage in meaningful judicial review. *See Baneky v. Apfel*, 997 F.Supp. 543, 547 (S.D.N.Y.1998).  A Court should not hesitate to remand a matter for further explanation when the Court is unable to fathom the ALJ's rationale in relation to evidence in the record. *See Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982). The ALJ must provide sufficient rationale in support of his decision to not find a listed impairment.  *Id.* The Court therefore remands this issue back to the Commissioner for further analysis consistent with this opinion.

## II.     Evaluation of Medical Evidence

Plaintiff argues that the ALJ should have assigned controlling weight to the January 8, 2010 Medical Source Statement ("MSS") prepared by RPAC Patricia Snider and Dr. Andrew Williams' opinions.  Plaintiff claims that the MSS is supported by clinical notes and objective evidence and further contends that it is not contradicted by substantial evidence in the record. Defendant claims that the ALJ properly evaluated the opinions of Dr. Williams and RPAC Snider and that those opinions were not entitled to controlling weight.

The Second Circuit has defined a treating physician as one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Coty v. Sullivan*, 793 F.Supp. 83, 85–86

(S.D.N.Y.1992) (quoting *Schisler v. Bowen*, 851 F.2d 43 (2d Cir.1988)).   Under the Regulations,

a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at

78–79; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993).   When an ALJ refuses to assign a

treating physician's opinion controlling weight, he must consider a number of factors to determine

the appropriate weight to assign, including:

> (i) the frequency of the examination and the length, nature and extent
> of the treatment relationship; (ii) the evidence in support of the
> treating physician's opinion; (iii) the consistency of the opinion with
> the record as a whole; (iv) whether the opinion is from a specialist;
> and (v) other factors brought to the Social Security Administration's
> attention that tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d)(2). The Regulations also specify that the Commissioner "will always

give good reasons in [her] notice of determination or decision for the weight [she] give[s]

[claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004)

(citing 20 C.F.R. § 404.1527(d)(2)); *see also Schaal v. Apfel*, 134 F.3d 501, 503–504 (2d

Cir.1998).

Social Security Ruling 06–03p provides:

> In addition to evidence from "acceptable medical sources," we may
> use evidence from "other sources," as defined in 20 CFR 404.1513(d)
> and 416.913(d), to show the severity of the individual's impairment(s)
> and how it affects the individual's ability to function. These sources
> include, but are not limited to:
>
> • Medical sources who are not "acceptable medical sources," such as
> nurse practitioners, physician assistants, licensed clinical social
> workers, naturopaths, chiropractors, audiologists, and therapists ...;
>
> Information from these "other sources" cannot establish the existence
> of a medically determinable impairment. Instead, there must be
> evidence from an "acceptable medical source" for this purpose.

11

>However, information from such "other sources" may be based on
>special knowledge of the individual and may provide insight into the
>severity of the impairment(s) and how it affects the individual's ability
>to function.

SSR 06–03p, 2006 WL 2329939, at *2–3 (S.S.A. 2006).

Opinions from medical sources that are not considered acceptable medical sources are "important and should be evaluated on key issues such as impairment severity and functional effects." *Anderson v. Astrue*, 2009 WL 2824584, at *9 (E.D.N.Y.2009) (quoting SSR 06–03p). The Regulations provide that the Secretary will consider, "evidence from other sources to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work." *See* 20 C.F.R. § 404.1513(e). In weighing the opinions of "other sources", the ALJ must use the same factors for the evaluation of the opinions from "acceptable medical sources" enumerated in 20 C.F.R. § 404.1527(d). *Canales v. Comm'r of Soc. Sec.*, 698 F.Supp.2d 335, 344 (E.D.N.Y.2010).

The opinion of a treating physician is not afforded controlling weight where the treating physician's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts.  *See Williams v. Comm'r of Soc. Sec.*, 236 F. App'x 641, 643-44 (2d Cir. 2007); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citing 20 C.F.R. § 404.1527(d)(2)).  "While the final responsibility for deciding issues relating to disability is reserved to the Commissioner, the ALJ must still give controlling weight to a treating physician's opinion on the nature and severity of a plaintiff's impairment when the opinion is not inconsistent with substantial evidence.  *See Martin v. Astrue*, 337 F. App'x 87, 89 (2d Cir. 2009).

### A.    Medical treatment for Back Impairments

On May 10, 2006, plaintiff sought treatment with Jean Bellinger, FNP-C ("Bellinger") at Heuvelton Health Center ("HHC") for complaints of back pain with tingling into her right leg. (T.

12

384).  Bellinger noted, "Musculoskeletal: is normal.  No spasticity or tremors.  Gait is normal".

Plaintiff was diagnosed with lumbar pain and prescribed Soma and Motrin.  On May 15, 2006,

plaintiff returned to HHC for a follow up appointment and advised that Soma decreased her pain

to "4 out of 10".  (T. 383).  Bellinger noted that x-rays of plaintiff's lumbar spine revealed

moderate degenerative changes with loss of normal lordosis consistent with muscle spasm.

Plaintiff was given a prescription for Flexeril and diagnosed with continued lower back pain.[2]  On

May 18, 2006, plaintiff stated that her back pain was improving.  (T. 382).

On May 25, 2006, plaintiff was treated by John B. Savage, Jr., M.D. at St. Lawrence

Orthopedic Specialists.  (T. 195).  Upon examination, plaintiff exhibited tenderness in her back

but negative straight leg raising.  Plaintiff was diagnosed with a chronic lumbar strain and advised

to participate in physical therapy.

On July 26, 2006, plaintiff returned to HHC complained of an injury to her lumbar spine

when she slipped and fell in her backyard.  (T. 379).  Plaintiff claimed her pain was "10 out of

10" and was prescribed Darvocet-N and advised to continue taking Flexeril.  On August 9, 2006,

plaintiff returned to Dr. Savage complaining of numbness in her right leg and claimed that

physical therapy was not helpful.  Dr. Savage prescribed Naprosyn and suggested that plaintiff

lose weight.[3]  (T. 194).

In September 2006, plaintiff treated with Dr. Vazquez-Senior at Massena Memorial

Hospital upon referral from Nurse Bellinger for epidural injections.  Dr. Vazquez-Senior's

---

[2] Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's* at 465, 725.

[3] Naprosyn is an anti-inflammatory used in the treatment of pain and inflammation. *Dorland's* at 1251.

examination of plaintiff was "normal".  In September 2006 and October 2006, plaintiff received lumbar steroid epidural injections.  (T. 205, 213).

On October 4, 2006, plaintiff was seen at HHC for pain management.  Bellinger noted that plaintiff received epidural injections in Watertown.  Plaintiff was given a prescription for Darvocet and encouraged to continue receiving epidural injections and discouraged from, "seeking pain medications at other facilities". (T. 372).

On December 6, 2006, plaintiff had an initial visit with Robert E. Hemond, a physician's assistant at Fletcher Allen Health Center ("FAHC" or "Fletcher Allen") Spine Institute.  Plaintiff claimed that she suffered from acute low back pain since May 2006.  Upon examination, Hemond noted that plaintiff was in mild distress, her gait was normal, she was able to heel/toe walk, she exhibited some tenderness with pain on straight leg raising on the left.  Hemond suggested new MRI films and prescribed Neurontin.[4] (T. 499).  On January 1, 2007, plaintiff returned to Fletcher Allen for a follow up appointment.  Hemond noted that a December 2006 MRI revealed arachnoiditis and opined, "[a]t this point, she does have signs of nerve root impingement". (T. 497).  On May 22, 2007, Dr. Elizabeth Ames referred plaintiff to the FAHC Pain Management Clinic for management of neuropathic pain.

On July 11, 2007, plaintiff was treated by Dr. Gonzalez-Munoz at that FAHC Pain Center.  Plaintiff complained of low back pain with bi-lateral leg pain.  Upon examination, Dr. Gonzalez-Munoz noted that straight leg raising produced pain on the right and diagnosed plaintiff with a lumbar strain and myofascial pain.  The doctor prescribed Baclofen and Topamax. (T. 476).

---

[4] Neurontin is an anticonvulsant used as adjunctive therapy in the treatment of partial seizures. *Dorland's* at 764, 1287.

On August 13, 2007, plaintiff returned to HHC for pain medications.  Plaintiff advised that she walked two miles to work every morning and that she planned on attending a work fair.  Plaintiff was treating with a neurologist and given Topamax and Cymbalta. (T. 364).

On September 5, 2007, Nurse Bellinger noted that plaintiff was "doing very well" and treating at Fletcher Allen in Burlington, Vermont.  Plaintiff was noted as "currently employed" and told to continue with her medication regimen.  (T. 362).  On November 29, 2007, plaintiff returned complaining of back pain after driving to Arizona.  Upon examination, Nurse Bellinger noted that plaintiff's legs trembled and advised plaintiff to continue taking Topamax and Cymbalta. (T. 363).

On December 11, 2007, plaintiff returned to the Fletcher Allen Pain Clinic for a follow up examination.  Dr. Gonzalez-Munoz observed plaintiff walk and stand with a normal gait and noted that her examination was unchanged and "was minimal on today's visit". (T. 468).  Plaintiff was told to continue taking Topamax, Cymbalta and Baclofen.

On December 27, 2007, plaintiff presented at HHC for pain medications.  Bellinger noted that plaintiff was treating at Fletcher Allen but due to the distance and need for travel, HHC was consulting with Fletcher Allen to treat plaintiff locally with pain medications. (T. 358).  Bellinger noted that plaintiff had been in the emergency room on four occasions in the last two months complaining of back pain and that, "[s]he appears to be addicted to her pain medications".  Upon examination, Bellinger noted that plaintiff "gets up and down from the exam table without discomfort", "she is able to cross her leg in the office" and "ambulates well".  Plaintiff did not "grimace" nor did she "show any signs of pain".  However, plaintiff was not agreeable to injections and claimed that the TENS unit did not work.  Plaintiff was given a prescription for

Darvocet but cautioned to use it only as needed.  Bellinger noted that the physicians at Fletcher Allen referred plaintiff to a pain psychiatrist. (T. 359).

On March 17, 2008, plaintiff returned to HHC complaining of back pain after helping her neighbor.  Plaintiff went to the emergency room and was treated with morphine.  At the time of the visit, plaintiff was working three times a week for four hours a day.  After an examination, Bellinger diagnosed plaintiff with pain disorder with psychological factors and myofascial pain with low back pain.  Bellinger noted that plaintiff lacks coping and management skills and that plaintiff "was asking for a diagnosis of fibromyalgia" but that she was never diagnosed with fibromyalgia and that she did not have positive nerve conduction studies or a positive EMG. (T. 355).  Bellinger observed, "patient states that she does not want to work at this time".   Plaintiff was prescribed physical therapy, Baclofen, Darvocet and Cymbalta and an annual drug screen was scheduled "as required by the pain management policy at the hospital". (T. 355).

On June 17, 2008, plaintiff had a follow up visit with Hemond.  Hemond noted that plaintiff returned to work in December 2007 and worked until April 2008 and he opined that two MRIs, "revealed no significant nerve root impingements or disk herniations". (T. 486).  Upon examination, plaintiff's gait and strength were normal and Hemond opined that plaintiff could tolerate "light work". (T. 486).

On May 12, 2008, plaintiff saw RPAC Patricia Snider ("Snider") to reestablish herself as a patient at the Cerebral Palsy Association of the North Country.  (T. 570).  Plaintiff complained of swelling in her left hand and numbness.  Snider noted that plaintiff was treating with the Spine Clinic at Fletcher Allen Health Center and that she had received a diagnosis of arachnoiditis.[5]

---

[5] Arachnoiditis is "inflammation of the arachnoid membrane often with involvement of the subjacent subarachnoid space." *Stedman's Medical Dictionary* (27th ed.2000), available at Westlaw STEDMANS.

(T.570).  At the time of the visit, plaintiff was taking Topamax[6], Darvocet[7], Cymbalta[8] and

Baclofen[9] for issues related to her back pain.  Snider diagnosed plaintiff with "low back pain -

chronic" and noted, "no scripts needed".  (T. 570).   On June 3, 2008, plaintiff returned to treat

with Snider and Snider noted plaintiff walked very slowly and had a limited range of motion in

her back.  (T. 569).  Snider diagnosed plaintiff with possible fibromyalgia.  (T. 569).

From June 30, 2008 until February 18, 2009 plaintiff sought treatment at the Cerebral

Palsy Association on ten different occasions for a variety of complaints with only two visits

related to back pain. (T. 553- 569).  On June 30, 2008, plaintiff complained of continued neck and

back pain and displayed a limited range of motion.  Plaintiff was directed to continue with her

current medication. (T. 568). On January 20, 2009, plaintiff complained of numbness in her feet

and asked for a referral to a pain clinic.  (T. 555).  Snider noted, "I feel she has fibromyalgia".

Snider referred plaintiff to Dr. Khan and gave her a "handout" from the Mayo Clinic regarding

fibromyalgia.

On February 2, 2009, plaintiff was examined by Dr. Ayaz Khan at Canton-Potsdam

Hospital upon referral from Snider. (T. 582).  Plaintiff complained of generalized pain all over her

body with pain worse in the lower back associated with numbness and tingling in her extremities.

Dr. Khan noted that, "patient also states that she has been diagnosed with arachnoiditis at the

Vermont Pain Center, although the MRI does not suggest so".  Upon examination, Dr. Khan

noted, no spasm, tenderness generalized all along the lumbar spine and along the cervical spine,

---

[6] Topamax is an anti-convulsant used to treat partial seizures in adults. *Dorland's Illustrated Medical Dictionary*, 1965 (31st ed.2007).

[7] Darvocet is a mild narcotic analgesics prescribed for the relief of mild to moderate pain, with or without fever. *Dorland's* at 479.

[8] Cymbalta is used in the treatment of major depressive disorder. *Id.* at 465, 580.

[9] Baclofen is a muscle relaxant. *See Stedman's Medical Dictionary* (27th ed.2000).

full range of motion, normal reflexes, no sensory deficit.  (T. 584).  Dr. Khan ordered a new MRI

to "rule out arachnoiditis" and made a "presumptive" diagnosis of myofascial pain syndrome.  Dr.

Khan prescribed Lyrica for plaintiff's neuropathic symptoms.[10]

On March 16, 2009, plaintiff had a follow up visit with Snider and advised that she was

treating with Dr. Khan for low back pain and that he planned to "do an epidural". (T. 648).

Plaintiff stated that Dr. Khan prescribed Lyrica, Soma, Cymbalta and Ultram.[11]

On May 26, 2009, plaintiff had a follow up with Dr. Khan who noted, "she is much better

today". (T. 782).  Dr. Khan's examination of plaintiff's lumbar spine revealed tenderness with

flexion-extension slightly limited due to pain in the extreme, no motor or sensory deficits, normal

gait and coordination intact. (T. 782).  Dr. Khan diagnosed plaintiff with degenerative disc

disease of the lumbar spine, lumbar radiculopathy and myofascial pain syndrome.  On June 26,

2009, Dr. Khan administered a trigger point injection of the cervical spine and on July 9, 2009,

Dr. Khan performed a lumbar steroid injection.  (T. 784-85).

On July 17, 2009, plaintiff was treated at CP Family Health Center by a provider whose

name is illegible.  However, it was noted that plaintiff's "fibromyalgia pain in gone". (T. 654).

On August 19, 2009, plaintiff returned to Dr. Khan for a follow up visit and advised that

she was referred to a neurosurgeon in Vermont. (T. 786). Plaintiff claimed that the surgeon

recommended conservative treatment and Dr. Khan noted that plaintiff, "continues to smoke

marijuana and taking two Soma at night without our consent".  Dr. Khan's examination of

---

[10]  Lyrica is a medication used to relieve neuropathic pain and to relieve the pain of fibromyalgia. www.ncbi.nim.nih.gov/pubmedhealth/PMH0000327.

[11]  Soma is a centrally acting skeletal muscle relaxant, for the symptomatic management of acute, painful musculoskeletal disorders. *Dorland's* at 301, 1759. Ultram is used for the treatment of moderate to moderately severe pain following surgical procedures. *Id.* at 2027.

plaintiff revealed tenderness and minimal spasm on the lumbar spine with motor and sensory intact.  Plaintiff's gait and coordination were normal and flexion-extension limited at the extreme. Dr. Khan's diagnosis and course of treatment remained the same.

On September 18, 2009, plaintiff had her last visit with Dr. Khan. (T. 788).  Dr. Khan noted that plaintiff, "got a little impatient while talking to me, as she had to wait a little in the clinic and she was in a hurry".  Plaintiff did not want to wait and Dr. Khan indicated that he need to spend time with her before he could give prescriptions "straight away".  Dr. Khan's examination of her lumbar spine revealed, "basically tenderness in the lumbosacral spine and in the neck".  Upon conclusion of the examination, he noted, "[t]he patient said she is going to transfer her care to Burlington, because she does not want to wait in this clinic anymore, which is fine with me.  We will transfer her records when she finds a new doctor".

On December 1, 2009, Snider noted that plaintiff refilled her prescriptions and advised that she would not be able to be seen in Vermont anymore and that she would reschedule her appointment with Dr. Khan. (T. 665).

On January 8, 2010, a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" was prepared by Snider and co-signed by Dr. Williams. (T. 674-77).  Snider and Williams opined that plaintiff can lift or carry less than ten pounds occasionally and frequently, that she can stand and/or walk for less than two hours in an eight hour workday and that she can sit for less than six hours in an eight hour workday and that she was limited in her ability to push and/or pull with her upper extremities. (T. 674-75).  Snider and Williams noted that plaintiff "has fibromyalgia and neck pain" and that she could never climb or crawl and could only occasionally balance, kneel, crouch and stoop.  Snider and Williams opined that plaintiff has no limitations with seeing, hearing, or speaking.  (T. 676).

**B.     Analysis of ALJ's Conclusions Regarding MSS**

The ALJ discussed Dr. Williams' assessment:

> A treating source assessment from A. Williams, M.D. (Exhibit 27F) completed in January 2010 was considered but given less weight than the report of consultative examiner Dr. Naughten. The Administrative Law Judge finds that the assessment (essentially for less than sedentary exertion, i.e., lift/carry less than 10 pounds, stand/walk for less than two hours in an eight-hour day and sit for less than six hours in an eight-hour day) does not adequately explain medical and clinical findings needed to account for the described level of pain and functional limitations. Dr. Williams merely stated that the claimant's fibromyalgia and chronic neck pain impaired her ability to sit, stand, walk and lift/carry. It is noted again that other treatment providers were of the opinion that the claimant's cervical issues were not of a level that required surgery and that conservative treatment was recommended. (T. 15).

Based upon the Regulations, Snider is not a treating source subject to the treating physician rule because a physician's assistant is not an acceptable medical source. *House v. Comm'r of Soc. Sec.*, 2012 WL 1029657, at *8 (N.D.N.Y. 20112) (citing 20 C.F.R. §§ 404.1513(d), 416.913(d)). Accordingly, the ALJ was not compelled to afford Snider's opinions controlling weight. Further, while the January 2010 MSS was co-signed by Dr. Williams, the Court finds no evidence that Dr. Williams had a treating relationship with plaintiff. *Towers v. Astrue,* 2010 WL 3338724, at *4 (N.D.N.Y. 2010). The record contains only one treatment record prepared by Dr. Williams on November 16, 2008 indicating that Dr. Williams treated plaintiff for complaints of stomach pain. Dr. Williams made no diagnosis or any reference to plaintiff's back impairments. (T. 560).

Even assuming Dr. Williams was a treating physician, the substantial evidence in the record does not support Dr. Williams' opinion. The MSS is not supported by plaintiff's treatment records from the CP Family Health Center or Snider's clinical findings. Snider treated plaintiff a total of six time for back impairments over the course of a year and a half. Snider primarily

treated plaintiff for unrelated complaints including asthma, depression, stomach issues and headaches.  Moreover, Snider's notes are very sparse with respect to her observations and what assessments she made, if any, after physically examining plaintiff during visits.  To wit, records simply state "neck pain" or "decreased ROM" or "walks slowly".  (T. 568, 570).  Snider's notes do not contain support for the existence of the extensive physical limitations outlined in the MSS.  Further, Nurse Snider and Dr. Williams provide no objective support for their conclusions and merely state that, "Pt [patient] has fibromyalgia and chronic neck pain which impairs all of above."  There is no mention of any objective tests or results of any examinations to support the extensive limitations.

In addition, the opinions expressed by Nurse Snider and Dr. Williams are not supported by substantial evidence in the record and the opinions of other treating sources and physicians including Drs. Khan, Savage, Gonzalez-Munoz and Nurse Bellinger.  These providers consistently noted that plaintiff's physical examinations were unremarkable, minimal or normal.  The MSS is also belied by plaintiff's own testimony and daily activities.  During the course of her treatment, plaintiff walked two miles to work each morning, drove to Arizona and was employed from December 2007 until approximately April 2008.  (T. 362).

Based upon the record, the Court does not find error in the ALJ's assessment of Snider and Dr. Williams' January 2010 opinion.  The ALJ provided adequate explanations and reasons for refusing to assign controlling weight to this assessment.  Accordingly, the ALJ need not address this issue on remand.

**III.     Credibility**

Plaintiff claims that the ALJ failed to acknowledge that plaintiff has undergone medication changes, trials of various treatment modalities, and referrals to specialists, which plaintiff's contends are all actions undertaken by plaintiff to indicate her allegations are credible.

"The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).  The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence.  *See* SSR 96-7p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements (SSR "96-8p"), July 2, 1996, WL 374186, at *2 (SSA 1996); *see also* 20 C.F.R. §§ 404.1529, 416.929.  One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record.  SSR 96-7p, 1996 WL 274186, at *5 (SSA 1996).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.  *See*

*Saxon v. Astrue*, 781 F. Supp. 2d 92, 105 (N.D.N.Y. 2011) (citing 20 C.F.R. §§ 404.1529(c)(4),

416.929(c)(4)).  An ALJ rejecting subjective testimony must do so explicitly and with specificity

to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and

whether his decision is supported by substantial evidence.  *Melchior v. Apfel*, 15 F. Supp. 2d 215,

219 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)

(citations omitted)).  The Commissioner may discount a plaintiff's testimony to the extent that it is

inconsistent with medical evidence, the lack of medical treatment, and her own activities during

the relevant period.  *See Howe-Andrews v. Astrue*, No. CV-05-4539 (NG), 2007 WL 1839891, at

*10 (E.D.N.Y. 2007).

      In this case, the ALJ based his findings that claimant's statements concerning the intensity,

persistence and limiting effects of her symptoms were not credible based on SSR 96-4P, SSR 96-

7p, and 20 C.F.R. §§ 404.1529, 416.929.   The ALJ concluded:

> While the claimant has severe impairments by definition, her
> allegations of totally disabling symptoms and functional limitations
> are not supported by the evidence as a whole.  She alleged disability
> as of May 2006 but testified that she worked for H&R Block doing
> taxes for about three months in 2007, where she sat all day but did no
> lifting. (T. 15).

Additionally, the ALJ makes note of plaintiff's use of cannibus, stating that there is "insufficient

evidence of total abstinence [of cannibus use] on a sustained level, and the claimant's overall

credibility is affected by her admitted use of an illegal substance."  (T. 15).

      After a careful review of the Administrative Transcript, the Court finds that the ALJ failed

to apply the standard, enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(iv), in assessing plaintiff's

credibility.  The ALJ discussed plaintiff's daily activities, i.e., her time spent watching television,

trying to do housework, napping, visiting her neighbors, and going to church on holidays.  (T.

13). However, the ALJ failed to discuss plaintiff's medications including her type, dosage,

effectiveness and side effects of any medications taken and other treatment/measures received and taken to relieve symptoms.  To wit, plaintiff's received several different prescription medications for her back pain, attended physical therapy, used a TENS unit[12], was examined by a neurologist and received epidural injections on more than one occasion.  The ALJ failed to discuss this portion of the medical record in his analysis of plaintiff's credibility.  The ALJ relied upon plaintiff's cannibus use and the fact that she briefly worked at H&R Block for three months as reasons for finding plaintiff "not credible".  Based upon plaintiff's medical history, the ALJ should have discussed her treatment.  *See Guarino v. Comm'r of Social Sec*.  2010 WL 199721, at *10 (N.D.N.Y. 2010) (citing *Dailey v. Barnhart*, 277 F.Supp.2d 226, 239 (W.D.N.Y.2003) (noting that SSR 96-7p should likely have enhanced the plaintiff's credibility because the plaintiff "has seen a variety of physicians and specialists, has followed her prescribed treatments, has taken her medications ..., and has even discussed other 'experimental treatments' with [her treating physician]")).  Pursuant to the regulations, the objective medical evidence is the initial factor that triggers an assessment of the credibility of the claimant's statements about the intensity, persistence, or functionally limiting effects of pain.  *Sanchez v. Astrue*, 2010 WL 101501, at *15 (S.D.N.Y. 2010).  The ALJ's obligation to explain his reasoning finding plaintiff "not credible" is particularly important considering that the ALJ found plaintiff's cervical and lumbar disc disease, fibromyalgia and myofascial pain to be severe impairments.  *See Adamik v. Astrue*, 2009 WL 6337910, at *19 (S.D.N.Y. 2009) (trigger point injections and use of various prescription medications appear to support plaintiff's credibility).

---

[12] Transcutaneous electrical nerve stimulation. *Dorland's* at 1905.

Accordingly, upon remand, the ALJ should conduct a thorough assessment of plaintiff's

treatment and medications within the context of plaintiff's credibility pursuant to the Regulations.

## IV.    RFC

RFC is defined as: "what an individual can still do despite his or her limitations." *Melville*

*v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).  "Ordinarily, RFC is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a regular and

continuing basis, and the RFC assessment must include a discussion of the individual's abilities

on that basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an

equivalent work schedule." *Id.*

SSR 96-8P provides:

> The RFC assessment must first identify the individual's functional
> limitations or restrictions and assess his or her work-related abilities
> on a function-by-function basis, including the functions in paragraphs
> (b), (c), and (d) of 20 C.F.R. §§ 404.1545, 416.945.  Only after that
> may RFC be expressed in terms of the exertional levels of work,
> sedentary, light, medium, heavy, and very heavy.

1996 WL 374184, at *1 (July 2, 1996).

Here, the ALJ found that plaintiff has the RFC:

> to lift and/or carry 20 pounds occasionally and 10 pounds frequently,
> stand and/or walk for a total of six hours in an eight-hour workday, sit
> for a total of six hours in an eight-hour workday, and occasionally
> climb, balance, stoop, kneel, crouch and crawl.  She should avoid
> more than moderate exposure to fumes, odors, dust, gases, poor
> ventilation, extreme temperatures and humidity. (T. 12).

Plaintiff argues the ALJ's RFC analysis does not contain all of plaintiff's impairments.

Plaintiff contends that the ALJ failed: (1) to acknowledge plaintiff's limitations stemming from

her severe impairments: Crohn's disease and colitis; and (2) to acknowledge plaintiff's full range

of impairments including limitations in sitting, standing and walking for lengthy periods. (Dkt. No. 15, p. 22).[13]

###### A.   Crohn's Disease and Colitis

Plaintiff argues that the ALJ should have recognized that her Crohn's disease and colitis, "imposed limitations such as frequent missed days from work and the need for frequent, unscheduled, and possibly lengthy breaks from work". (Dkt. No. 15, p. 22). Plaintiff's conclusory arguments are not supported by her medical record.  It is undisputed that plaintiff suffers from Crohn's disease and colitis, but tests and treatment notes document mild overall presentation with some improvement. (T. 553-566).  *Mosinski v. Astrue*, 2011 WL 2580353, at *8  (N.D.N.Y. 2011) (the medical assessments and clinical findings demonstrate medical improvement sufficient to support the ALJ's determination; physicians found little to no physical limitations, other than the need for ready access to restroom facilities).  In October 2008, Snider noted that plaintiff treated with Dr. Mazzotta for complaints of vomiting and constipation but noted that she has "no f/u visit scheduled".  Snider diagnosed plaintiff with Crohn's Disease and gave her a handout regarding diet and foods to avoid. (T. 562).  In December 2008, Dr. Williams noted that plaintiff's "GI - mildly improved" and suggested that plaintiff "f/u with Mazzotta". (T. 560).  In January 2009, Snider noted that plaintiff suffered from colitis and urged plaintiff to schedule an appointment with Dr. Mazzotta, noting "did not f/u with Dr. Mazzotta as recommended". (T. 556-57).  The record contains no reports or treatment notes from Dr. Mazzotta.  Moreover, in the January 2010 MSS, Snider and Dr. Williams make no mention of plaintiff's Crohn's Disease or colitis and do not opine that she suffers from any limitations as a result of these impairments.  Accordingly, the

---

[13] Plaintiff also claims that the RFC is flawed based upon the ALJ's improper dismissal of Dr. Williams and RPAC Snider's opinion.   In Part II, the Court found no error in the ALJ's determination in this regard.  Thus, this argument will not be revisited herein.

Court finds no error in the ALJ's RFC analysis and the omission of any limitations based upon these impairments.

### 2.   Alternating positions

The Court finds similar flaws with plaintiff's claim that she must change positions frequently to accommodate her pain and symptoms.  Plaintiff's claims in this regard are unsupported by substantial evidence.  Indeed, Snider and Dr. Williams did not opine that plaintiff "must periodically alternate sitting and standing to relieve pain or discomfort" as they did not check that box in the Medical Source Statement. (T. 675).  Even assuming the evidence supported plaintiff's assertion, when the only limitation on plaintiff's ability to do a full range of light or sedentary work is the need to be able to alternate between sitting and standing positions, this would not affect the remaining occupational base of light and sedentary work available to plaintiff. *Williams v. Comm'r of Social Sec.*, 2010 WL 2401280, at *8 (N.D.N.Y.2010) (citing SSR 83–12, 1983 WL 31253, at *2 (S.S.A.1983)).  Accordingly, the Court finds that substantial evidence supports the ALJ's conclusions with respect to plaintiff's limitations.

While the Court finds that the RFC analysis is not flawed for the aforementioned reasons, the ALJ must still revisit and reconsider this analysis as the Court has concluded that RFC is not supported by substantial evidence because the ALJ failed to properly assess plaintiff's credibility.

## V.   Step Five of the Sequential Analysis

Plaintiff argues that the ALJ inappropriately relied exclusively on the Medical–Vocational Guidelines, or "grids."  and erred in failing to elicit vocational expert testimony. (Dkt. No. 15, p.23).  Ordinarily, the Commissioner can meet his burden in connection with the fifth step of the relevant disability test by utilizing the grids.  *Rosa*, 168 F.3d at 78; *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir.1986). The grids take into consideration a claimant's RFC, as well as his or her age,

education and work experience, in order to determine whether he or she can engage in substantial gainful work in the national economy. *Rosa*, 168 F.3d at 78. Whether or not the grids should be applied in order to make a step five determination presents a case-specific inquiry which depends on the particular circumstances involved. *Bapp*, 802 F.2d at 605. In general, when the claimant suffers only from exertional impairments[14], the Commissioner may satisfy his burden of proof by using the applicable girds. *See Pratt*, 94 F.3d at 39. The girds are important because they "take into account the claimant's functional capacity in conjunction with the claimant's age, education, and work experience" in order to make a determination of disability. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). In general, the ALJ may satisfy his burden of proof by relying on the girds and he therefore need not consult a vocational expert. *See id.* at 78 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2). If, on the other hand, nonexertional impairments, including pain, significantly limit the range of work permitted by exertional limitations, then use of the grids is inappropriate, in which case further evidence and/or testimony is required. *Rosa*, 168 F.3d at 78; *Bapp*, 802 F.2d at 605–06. In such cases, the ALJ may rely on the grids only as a framework for decision-making. 20 C.F.R. § 416.969a(d). Nonexertional limitations include postural limitations such as limitations in climbing, reaching, stooping, crawling, balancing, and kneeling. § 416.969a(c). As one court has explained, [a] nonexertional limitation is one imposed by the claimant's impairments that affect [his or] her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain. *Sobolewski v. Apfel*, 985 F.Supp. 300, 310 (E.D.N.Y. 1997) (citing 20 C.F.R. § 404.1569(a), (c)). In the last step of the

---

[14]An exertional impairment is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e., sitting, standing, walking, lifting, carrying, pushing, and pulling). *See* 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *see also Rodriguez v. Apfel*, No. 96 Civ. 8330 (JGK), 1998 WL 150981, at *10, n. 12 (S.D.N.Y. 1998).

disability analysis, the Commissioner bears the burden of proof for the final determination of disability. *See Pratt v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996).

As discussed in Parts 1 and III, the ALJ failed to properly assess plaintiff's impairments at step three of the sequential analysis and failed to properly assess plaintiff's credibility. Thus, the ALJ's findings at the fifth step of the sequential analysis are affected. The Court has already determined that remand is necessary for further proceedings. Accordingly, any additional analysis may require the testimony of a vocational expert regarding the effect that any nonexertional impairments may have on the plaintiff's ability to perform basic work activities. *See Pronti v. Barnhart*, 339 F.Supp.2d 480, 487 (W.D.N.Y.2004).

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying benefits be **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with the above; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated:  August 31, 2012
         Albany, New York

Mae A. D'Agostino
U.S. District Judge